UNITED STATES DISTRICT COURT
<u>WESTERN DISTRICT OF NEW YORK</u>

| | | |
|---|---|---|
| RIENNA H., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case # 1:19-cv-1085-DB |
| | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | MEMORANDUM DECISION |
| | § | AND ORDER |
| Defendant. | § | |

## <u>INTRODUCTION</u>

Plaintiff Rienna H. ("Plaintiff") brings this action pursuant to the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner") that denied her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the Act). *See* ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to proceed before the undersigned in accordance with a standing order (*see* ECF No. 13).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF Nos. 7, 11. Plaintiff also filed a reply. *See* ECF No. 12. For the reasons set forth below, Plaintiff's motion (ECF No. 7) is **DENIED,** and the Commissioner's motion (ECF No. 11) is **GRANTED.**

## <u>BACKGROUND</u>

Plaintiff protectively filed her DIB application on February 28, 2017, alleging disability beginning November 20, 2015 (the disability onset date). Transcript ("Tr.") 178-79. Plaintiff alleged disability due to (1) back injury; (2) severe back pain; and (3) depression related to pain. Tr. 212. Plaintiff's application was denied initially on July 1, 2017, after which she requested an administrative hearing. Tr. 81, 111. On October 3, 2018, Administrative Law Judge Bonnie

Hannan (the "ALJ") conducted a video hearing from Alexandria, Virginia. Tr. 20, 41-80. Plaintiff appeared and testified from Rochester, New York, and was represented by Mark R. Blum ("Mr. Blum"), an attorney. Tr. 20. Judy Cotton, Mr. Blum's associate, also attended the hearing. *Id*. David Van Winkle, an impartial vocational expert ("VE"), also appeared and testified at the hearing. *Id*.

On November 30, 2018, the ALJ issued an unfavorable decision, finding that Plaintiff was not disabled. Tr. 20-34. On June 27, 2019, the Appeals Council denied Plaintiff's request for review. Tr. 1-6. The ALJ's November 30, 2018 decision thus became the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).

## LEGAL STANDARD

### I.   District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. § 405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1990).

### II.   The Sequential Evaluation Process

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71

(1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id*. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments meeting the durational requirements, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id*. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, the claimant is disabled. *Id*. § 404.1509. If not, the ALJ determines the claimant's residual functional capacity, which is the ability to perform physical or mental work activities on a sustained basis notwithstanding limitations for the collective impairments. *See id*. § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id*. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id*. § 404.1520(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national

economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

## ADMINISTRATIVE LAW JUDGE'S FINDINGS

The ALJ analyzed Plaintiff's claim for benefits under the process described above and made the following findings in her November 30, 2018 decision:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2018;

2. The claimant has not engaged in substantial gainful activity since November 20, 2015, the alleged onset date (20 CFR 404.1571 *et seq.*);

3. The claimant has the following severe impairments: obesity, cervical and lumbar degenerative disc disease (status post (s/p) surgeries) and asthma (20 CFR 404.1520(c));

4. The claimant does not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526);

5. Through the date last insured, the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a)[1] except that she can push and/or pull as much as she can lift and/or carry. She can occasionally reach overhead bilaterally and frequently handle, finger and feel bilaterally. She can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl.  She can never climb ladders, ropes or scaffolds, work with moving mechanical parts nor work at unprotected heights. She can tolerate occasional exposure to humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme heat or cold and vibrations.  She will also need access to a restroom, all while remaining on task;

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565);

7. The claimant was born on August 25, 1980 and was 35 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563);

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564);

---

[1] "Sedentary" work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2);

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a);

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 20, 2015, through the date of this decision (20 CFR 404.1520(g)).

Tr. 20-34.

Accordingly, the ALJ determined that, for a period of disability and disability insurance benefits filed on February 28, 2017, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act. Tr. 34.

## **ANALYSIS**

Plaintiff asserts two points of error. Plaintiff argues that: (1) the ALJ failed to properly evaluate Listing 1.04(A); and (2) the ALJ's physical RFC determination was not supported by substantial evidence. *See* ECF No. 7-1 at 1, 15-22. The Commissioner argues in response that: (1) Plaintiff failed to meet her burden to show that her impairments met all of the specified criteria of Listing 1.04(A), and (2) substantial evidence supports the ALJ's evaluation of the medical opinion evidence and the ALJ's RFC finding. *See* ECF No. 11-1 at 18-25.

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir.2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa*, 168 F.3d at 77.

Plaintiff alleges disability due to neck and back injuries incurred in a motor vehicle accident in November 2015. She initially received conservative treatment and eventually had surgery on both her cervical and lumbar spine. Although the evidence shows some limitations in functioning, the Court finds that the record as a whole did not support the conclusion that Plaintiff's impairments were so severe that she could not perform any work. Rather, the record supports the ALJ's conclusion that Plaintiff could perform a limited range of sedentary work.

On November 24, 2015, Plaintiff visited her primary care provider, Carrie VanGrol, NP ("Ms. VanGrol"), with complaints of neck and left shoulder pain stemming from her motor vehicle accident. Tr. 329. Ms. VanGrol reviewed emergency department records and noted that a cervical spine CT after the accident showed osteoarthritic changes, osteophyte formation, and disc protrusions at C4-5, C5-6, and C6-7 with lateral recess narrowing and central canal stenosis. *Id*. A thoracic spine CT from November 20, 2015 showed mild osteoarthritic changes and no acute fracture. Tr. 258. Upon examination, Plaintiff had full range of motion in her left shoulder. *Id*. She had palpable neck spasms and limited neck rotation, but otherwise she had full range of motion in her neck. *Id*. She had lumbar paraspinal tenderness and appeared anxious and tearful. Tr. 329. Ms. VanGrol recommended physical therapy and a neck MRI. Tr. 330. She stated that Plaintiff was "out of work for [the] next week." *Id*.

On December 2, 2015, an MRI of the cervical spine showed degenerative changes, multiple spasms, multilevel disc disease, and moderate spinal stenosis. Tr. 256, 264. Her two lower cervical discs were noted as bulging and impinging on the neural foramina. *Id*.

Plaintiff began physical therapy on December 15, 2015. Tr. 261. She reported pain in her neck and left arm. *Id*. On examination, she had restricted cervical spine range of motion in all directions and hypersensitivity from her neck down her left upper extremity. *Id*. Plaintiff attended

6

eight sessions of physical therapy through January 2016. Tr. 317-18. In January 2016, Plaintiff reported she was doing well overall. Tr. 318.

Plaintiff returned to Ms. Van Grol for follow-up on January 4, 2016 and reported being unable to hold her arms up to cut her children's hair.  Tr. 337.  She reported difficulty sleeping, increased anxiety, and pain an hour after her physical therapy sessions.  *Id*. On examination, Plaintiff appeared uncomfortable and had paraspinal tenderness in her neck.  Tr. 338.  Ms. Van Grol continued Plaintiff's "pain meds" (listed in the "Active Medications" as Hydrocodone-Acetaminophen), physical therapy for her pain, Ativan for her anxiety, and excused her from work. Tr. 335, 338. On January 27, 2016, the subjective notations in the treatment record indicate some musculoskeletal pain but no limitation in range of motion; no paresthesias or numbness; and no neurological weakness. Tr. 270. Free range of motion was noted in all extremities. *Id*.

On February 4, 2016, Plaintiff attended a neurosurgery consultation with Nathaniel Brochu, PAC ("Mr. Brochu"), and Seth M. Zeidman, M.D. ("Dr. Zeidman"), at Rochester Brain & Spine Neurosurgery and Pain Management ("Rochester Brain & Spine"). Tr. 278-81. She described symptoms of pain in her neck that radiated down both arms when she turned her head a certain way. Tr. 278. She also reported a history of lumbar pain, which increased after the accident and radiated down her right leg. *Id*. Yet, in the review of symptoms, she denied back pain, leg pain or weakness of the arms or muscles. Tr. 279. She also denied any difficulty with fine motor skills or balance. *Id*. She reported she had tried physical therapy, but it made her pain slightly worse. *Id*. She also reported she smoked cigarettes daily. *Id*. Upon examination, Plaintiff appeared uncomfortable, but she responded appropriately and otherwise appeared alert and cooperative. *Id*. She reported pain with palpation and with extension and lateral bending of her neck; pain to palpation of the lumbar spine; diminished sensation in the right arm; and slightly decreased

7

strength in her right arm compared to the left. Tr. 279-80. Plaintiff walked with a slightly antalgic gait. Tr. 280). Mr. Brochu recommended surgery but advised Plaintiff that she must quit smoking cigarettes before she could proceed with surgery. Tr. 281. He referred Plaintiff to pain management; ordered an MRI of her lumbar spine; and stated that Plaintiff should remain off work in the interim. *Id*. Dr. Zeidman concurred with Mr. Brochu's assessment. *Id*.

On March 1, 2016, Plaintiff told Ms. VanGrol that she quit smoking cigarettes and was using an electronic cigarette. Tr. 302. She acknowledged that she needed to quit smoking completely to have surgery. *Id*. She said her anxiety was high and her pain level remained unchanged. *Id*.

On April 4, 2016, Plaintiff saw Naseer Tahir, M.D. ("Dr. Tahir"), at Rochester Brain & Spine, for pain management treatment. Tr. 339. Her neck was reported as normal; she had normal gait; negative SLR testing bilaterally; and sensory was normal to light touch.  Tr. 340. Objectively, she reported tenderness on the right and left side of her neck and along the midline of her lumbar spine; she had normal muscle tone in her neck and back with intact motor strength in her arms and legs; she had limited lateral flexion in the neck; and she complained of pain with passive range of motion. *Id*. She walked on her heels and toes normally; she reported no pain with straight leg raise ("SLR") testing but some pain with trunk rotation. *Id*. She had intact sensation and coordination. *Id*. An MRI of the lumbar spine showed a right central L5-S1 disc extrusion with slight impingement on the S1 nerve roots and a central L4-L5 disc extrusion with mild impingement on the dural sac. Tr. 305. Plaintiff received an epidural steroid injection in her neck the following month. Tr. 315.

Plaintiff saw Elizabeth Jefferson, RPAC ("Ms. Jefferson"), at Rochester Brain & Spine, on May 19, 2016. Tr. 309-14. Plaintiff rated her pain level 4/10 in her neck and 7/10 in her low back.

Tr. 309. She indicated that she used an electronic cigarette with no nicotine for about a week. Tr. 309. Ms. Jefferson advised Plaintiff that she needed six weeks without nicotine to proceed with neck surgery. Tr. 312. Ms. Jefferson referred Plaintiff to physical therapy for evaluation of her low back complaints. Tr. 313.

Plaintiff returned to Ms. Jefferson in June 2016, complaining of increased pain. Tr. 343. She rated her neck pain 7/10 and her low back pain 9/10. Tr. 343. She reported no relief from the steroid injection. Tr. 343. Plaintiff denied any difficulty with motor skills but reported trouble walking and was noted to be limping. Again, SLR testing right and left were negative, and her right upper extremity and lower extremity strength were normal. Tr. 344, 346. Plaintiff had intact sensation and coordination. Tr. 345. Ms. Jefferson advised Plaintiff to start physical therapy and to continue abstaining from nicotine. Tr. 348.

On July 19, 2016, Plaintiff had a comprehensive exam with Clifford J. Ameduri, M.D. ("Dr. Ameduri"), at Rochester Brain & Spine. Tr. 356-59. Plaintiff rated her pain 8/10 and stated she took pain medication previously prescribed by her primary care provider. Tr. 356-57. Upon examination, Plaintiff appeared in "moderate-severe distress." Tr. 358. She reported pain with cervical compression and straight leg raises at 30 to 35 degrees. *Id*. She had intact motor strength in her arms and legs, intact sensation, and intact coordination. *Id*. Although her MRI in April demonstrated a nerve root compression (Tr. 305), her lumbar myelogram in July 2016 demonstrated L4-L5 degenerative disc disease with mild to moderate neural foraminal narrowing. Tr. 367. Dr. Ameduri recommended tapering off hydrocodone and starting Tramadol. Tr. 356-57.

Plaintiff returned to Rochester Brain & Spine on October 26, 2016 for pre- and post-surgical care instructions. Tr. 389. She reported increased pain and difficulty holding onto things with her hands. *Id*. Upon examination, Plaintiff appeared uncomfortable sitting. Tr. 390. She had

moderate to severe muscle spasm in her neck and reported pain with palpation of the lumbar muscles. *Id*. She had intact sensation and slightly decreased motor strength in the right arm, and she walked with a slightly antalgic gait. *Id*. Plaintiff was fitted for a cervical collar and advised to use a bone growth stimulator daily for at least nine months after surgery. Tr. 392.

On November 7, 2016, Plaintiff had neck surgery with Dr. Zeidman. Tr. 394, 403. She received cervical discectomy and fusion at C5-7. Tr. 395. The pre- and post-operative diagnosis was cervical spondylosis without myelopathy.[2] Tr. 395. Two weeks later, Plaintiff reported doing fairly well. Tr. 405. Her strength, reflexes, and sensory examination were normal in the upper extremities, and she had a normal gait. Tr. 406. She was advised to wean out of her neck brace and begin using a bone growth stimulator. *Id*.

Plaintiff saw Cynthia Larson, PAC ("Ms. Larson"), at Rochester Brain & Spine, on January 17, 2017. Tr. 408. Plaintiff reported doing fairly well following surgery, although she had some recurring pain in the back of her neck that occasionally radiated to her shoulders. Tr. 408. She denied any weakness, numbness, or tingling in her arms. She reported continued complaints of low back pain radiating into her right leg. *Id*.

Upon examination, Plaintiff stood comfortably erect, although she cried frequently, reportedly due to her frustration with her lumbar symptoms. Tr. 409. She had a moderate spasm in the back of her neck and no spasm in the lumbar area. *Id*. She had full motor strength in her arms and slightly decreased motor strength in her legs and diminished sensation in her right side compared to her left. *Id*. She walked with a slightly antalgic gait, and she could get on and off the

---

[2] Myelopathy is an injury to the spinal cord due to severe compression that can result from degenerative disease or disc herniation. It is distinct from radiculopathy, which is the term used to describe pinching of the nerve roots, rather than compression of the cord itself (myelopathy). https://www.hopkinsmedicine.org/health/conditions-and-diseases/ myelopathy (last visited January 11, 2021).

examination table independently. *Id*. Ms. Larson referred Plaintiff for lumbar injections and physical therapy for her neck and back. *Id*.

On February 1, 2017, Plaintiff began physical therapy. Tr. 400. She reported she was "very limited" in her activities of daily living and needed a walker to get around the house. *Id*. Upon examination, Plaintiff demonstrated "major" limitations in lumbar range of motion and decreased motor strength in the right leg. *Id*. She reported she could sit in her favorite chair as long as she liked, stand for no more than 10 minutes, and lift only very limited weights, and she could not walk at all without increased pain. Tr. 401.

Two days later, on February 3, 2017, Plaintiff saw Ms. Larson at Rochester Brain & Spine. Tr. 411-12. The exam focused primarily on her neck complaints. She reported some improvement as her headaches had resolved and her neck pain was tolerable. Tr. 411. Upon examination, Plaintiff stood comfortably erect. Tr. 412. She had intact sensation and full strength in her arms. *Id*. She walked with a slightly antalgic gait without the use of any assistive device. Although Plaintiff stated that her last cigarette was two months ago (Tr, 411), it was noted that she smelled of cigarette smoke (Tr. 412). Ms. Larson advised Plaintiff to continue using the bone growth stimulator. Tr. 412.

On March 29, 2017, Plaintiff received an epidural steroid injection in her lumbar spine. Tr. 413. The next day, she saw Mr. Brochu at Rochester Brain & Spine. Tr. 415-19. Plaintiff reported that her neck was doing well, but she continued to experience low back pain. Tr. 415. A physical examination showed no spasm in the lumbar area and SLR testing was positive on both the left and the right. Tr. 416. There was some diminished sensation in her thighs, but her sensory was otherwise normal. Strength was similar to prior studies. Tr. 416. Plaintiff "walked with a slightly antalgic gait with her girlfriend stabilizing her." *Id*. An updated MRI of the lumbar spine taken in

11

February 2017 showed progressive degenerative endplate changes with a central extrusion resulting in severe spinal stenosis at L4-L5, a broad-based protrusion at L5-S1 level abutting and displacing the S1 nerve root, and foraminal narrowing at L4-L5 and L5-S1. Tr. 418, 423. Mr. Brochu advised Plaintiff to continue physical therapy before proceeding with lumbar surgery. Tr. 419.

Plaintiff returned to see Ms. Larson, at Rochester Brain & Spine, on May 8, 2017. Tr. 420. She reported a couple of recent falls due to her right leg "giving out." Tr. 420. She had not done physical therapy and stated she was "unsure if she could proceed with this." Tr. 420. She also said a lumbar injection had helped for about a week. *Id*. Upon examination, Plaintiff appeared uncomfortable sitting and standing. Tr. 421. She had positive SLR for the right and left legs, and her sensation was diminished to the right lower extremity as compared to lower left extremity; however, her strength upper was normal and lower similar to prior studies. *Id*. She walked with a slightly antalgic gait without any assistive devices. *Id*. Ms. Larson recommended that Plaintiff continue conservative treatment with lumbar injections and physical therapy. Tr. 423.

On May 24, 2017, Plaintiff attended a consultative physical examination with Harbinder Toor, M.D. ("Dr. Toor"). Tr. 248-53. She described back pain of 8/10 radiating into her legs with numbness and tingling, primarily on the right and neck pain of 8/10 radiating into her arms with numbness and tingling in her hands. Tr. 248. She said she needed help cooking and her ability to clean, do laundry, shop, care for her children, and shower varied. Tr. 249. Upon examination, Plaintiff appeared in moderate pain and walked with a slight limp to the right. *Id*. She reported difficulty with heel-to-toe walking and pain with squatting 20% of full and difficulty getting in and out of the chair and changing for the exam. *Id*. She complained of pain and stiffness in her neck and demonstrated a limited range of motion in her neck and lumbar spine. Tr. 250. She

declined to perform sitting and supine straight leg raises; she reported tingling and numbness in her hands and right leg; and she demonstrated 4/5 grip strength and reported mild difficulty grasping, writing, tying shoelaces, zipping a zipper, manipulating a coin or button, and holding an object with her hands. Tr. 250-51. Dr. Toor opined that Plaintiff had mild limitation with fine motor activities with the hands and a mild to moderate limitation in reaching; moderate limitations in rotating her neck and sitting a long time; and moderate to marked limitations in standing, walking, bending, lifting, and carrying. Tr. 251.

On the same day, Plaintiff attended a consultative psychiatric evaluation with Adam Brownfeld, Ph.D. ("Dr. Brownfeld"). Tr. 243-46. Plaintiff had no history of mental health treatment, but she reported difficulty sleeping due to pain, difficulty concentrating, sad moods, loss of interest, crying spells, diminished sense of pleasure, and social withdrawal since her accident. Tr. 243. She denied symptoms of cognitive deficits. Tr. 244. Dr. Brownfeld found no evidence of limitation in understanding, remembering, and applying simple and complex instructions; making work-related decisions; interacting adequately with supervisors, coworkers, and the public; sustaining concentration and performing a task at a consistent pace; and sustaining an ordinary routine and regular attendance at work. Tr. 245. Dr. Brownfeld opined that Plaintiff was moderately limited in regulating her emotions, controlling her behavior, and maintaining wellbeing. *Id*. He said Plaintiff's symptoms did not appear to be significant enough to interfere with her ability to function on a daily basis. Tr. 246.

On May 30, 2017, G. Feldman, M.D. ("Dr. Feldman"), a state agency medical consultant, reviewed the record in connection with the initial agency determination. Tr. 89-91. Dr. Feldman opined that Plaintiff could perform a range of sedentary work with a sit/stand option and limited overhead reaching. Tr. 89-90. On June 1, 2017, A. Dipeolu, Ph.D., a state agency physiological

consultant, reviewed the record and opined that Plaintiff did not have a severe psychiatric impairment. Tr. 86-87.

On June 28, 2017, Plaintiff saw Dr. Tahir, at Rochester Brain & Spine, for pain management. Tr. 428. She reported 50% pain reduction after injection treatment. *Id*. She rated her current pain level 8/10 in her back and 6/10 in her neck. *Id*. Plaintiff walked with a limping gait and used a cane. Tr. 429. She had a full range of motion in her neck; SLR testing was negative; heel toe walk was normal; and upper and lower muscle tone and strength were normal. *Id*.

Plaintiff returned to Rochester Brain & Spine on July 7, 2017 to discuss moving forward with lumbar surgery. Tr. 431. She reported pain with straight leg raises; she had limited range of lumbar motion due to stiffness; she had diminished sensation and motor strength in her legs; and she walked with an antalgic gait. Tr. 432. X-rays of her neck showed stable fusion with no acute abnormalities. Tr. 436. She was cleared for lumbar surgery and advised to return to physical therapy for her neck. *Id*.

On July 11, 2017, Plaintiff had lumbar surgery with Dr. Zeidman. Tr. 438, 445-48, 458-59. She followed up with Dr. Zeidman's office on July 24, 2017. Tr. 454-57. She rated her pain level 9/10 and expressed frustration with the lack of pain control. Tr. 454-55. Upon examination, Plaintiff had intact sensation and her strength remained similar to prior studies. Tr. 455. Three days later, on July 27, 2017, Plaintiff saw Ms. Jefferson, at Rochester Brain & Spine. Tr. 460-63. She described a pain level range between 5/10 and 8/10. Tr. 460. A physical examination remained unchanged. Tr. 461. A CT scan showed no acute finding or post-operative changes. Tr. 462. Plaintiff was advised to limit her narcotics intake due to complaints of nausea. *Id*.

Seven months later, on February 7, 2018, Plaintiff had cervical and lumbar myelograms. Tr. 465-76. The cervical myelogram showed mild multilevel degenerative changes, no significant

spinal stenosis, and arthropathy causing foraminal stenosis at C5-6 and C6-7. Tr. 465, 467. The lumbar myelogram showed multilevel degenerative changes, post-operative arachnoiditis, and a post-surgical bone fragment with possible compression of the right S1 and L5 nerve roots, likely due to bone graft material used in the surgery. Tr. 465-66, 469.

On February 14, 2018, Plaintiff established primary care with Natercia Rodrigues, M.D. ("Dr. Rodrigues"), at Manhattan Square Family Medicine. Tr. 484-89. The review of symptoms noted no muscle or joint aches; normal gait; and no paresthesias. Tr. 487. Although Plaintiff continued to complain of back pain through August 2018 (*see* Tr. 490, 494), there are no additional objective studies to review.

To meet Listing 1.04(A), a claimant must show proof of the following conditions:

1. A disorder of the spine, including but not limited to "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture," and

2. "Compromise of nerve root (including the cauda equina) or the spinal cord," and

3. "Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness)," and

4. "Sensory or reflex loss," and if there is involvement of the lower back,

5. "Positive straight-leg raising test" in both the sitting and supine position.

*Monsoori v. Comm'r of Soc. Sec.*, No. 1:17-CV-01161-MAT, 2019 WL 2361486, at *3 (W.D.N.Y. June 4, 2019) (citing Listing 1.04(A)).

Where, as here, a claimant alleges that she meets Listing 1.04(A) based on a lower back injury, disorder, or conditions she must meet all five criteria included in that listing. *Monsoori,*

2019 WL 2361486, at *4 *See Monsoori*, 2019 WL 2361486, at *4; *see also Scully v. Berryhill*, 282 F. Supp. 3d 628, 635 (S.D.N.Y. 2017) (citing Listing 1.04(A)). The claimant must also demonstrate that all five criteria were met simultaneously and for the necessary duration. *Id*. In other words, "when the listing criteria are scattered over time, wax and wane, or are present on one examination but absent on another, the individual's nerve root compression would not rise to the level of severity required by listing 1.04A." *Monsoori*, 2019 WL 2361486, at *4 (citing Acquiescence Ruling ("AR") 15-1(4), 80 FR 57418–02, 2015 WL 5564523, at *57420 (Sept. 23, 2015)). Furthermore, there must be evidence that straight-leg raising ("SLR") tests were positive in both the sitting and supine positions. *Id*.

> In this case, the ALJ found the following:

> While there is evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss, these symptoms and signs were not continuously present over a period of time at examinations.

Tr. 25. Thus, the ALJ found that Plaintiff met all the listing requirements for 1.04(A) except the durational requirement.

> The claimant bears the burden at step three to prove she meets the requirements necessary to meet or equal the Listings. Nonetheless, the ALJ is required to explain why a claimant failed to meet or equal the Listings "[w]here the claimant's symptoms as described by the medical evidence appear to match those described in the Listings." *Rockwood v. Astrue*, 614 F. Supp.2d 252, 273 (N.D.N.Y. 2009) (citation omitted). "While the ALJ may ultimately find that [a considered listing] do[es] not apply to Plaintiff, he must still provide some analysis of Plaintiff's symptoms and medical evidence in the context of the Listing criteria." *Critoph v. Berryhill*, No. 1:16-CV-

00417(MAT), 2017 WL 4324688, at *3 (W.D.N.Y. Sept. 28, 2017) (quoting *Peach v. Colvin*, No.

15-CV-104S, 2016 WL 2956230, at *4 (W.D.N.Y. May 23, 2016)).

Plaintiff argues that the requisite criteria under listing 1.04(A) were continuously present

for at least 12 months. *See* ECF No. 7-1 at 16-17. Although Plaintiff claims multiple instances of

"muscle weakness," the record actually documented near normal motor strength findings of "4/5,"

"4+/5," and "5-/5"[3] on multiple occasions. Tr. 251, 279-80, 310, 345-346, 390, 406, 409, 416-417,

421, 432, 461. Moreover, other examinations documented full and intact motor strength. Tr. 341,

344, 358, 412, 429. Additionally, although the record contained instances of "slightly diminished"

sensation in the right arm (Tr. 280, 310, 346, 409), it also contained several instances of intact

sensation in the arms (Tr. 341, 390, 406, 412). Similarly, the record contained some notations of

"slightly diminished" sensation in the right leg (Tr. 409, 416, 421, 429, 432), while other

examinations showed intact sensation in the legs (Tr. 341, 346, 358, 455, 461). The record also

documented intact reflexes or mostly normal findings of "2+" or "1+."[4] Tr. 279, 310, 341, 346,

352, 361, 372, 390, 406, 409, 412, 416, 421, 429, 432, 439, 455, 461, 488.

Based on the foregoing, Plaintiff failed to establish continuous motor loss accompanied by

sensory or reflex loss as required to meet Listing 1.04(A). *See Boston v. Berryhill*, No. 16-CV-

00342-LJV-HBS, 2017 WL 10605166, at *11 (W.D.N.Y. Aug. 2, 2017), *report and*

*recommendation adopted*, No. 16-CV-342, 2018 WL 5629919 (W.D.N.Y. Oct. 31, 2018) (quoting

the AR 15-1(4) and recognizing that, where "the listing criteria are scattered over time, wax and

---

[3] Strength findings of 4-, 4, and 4+ described as "good." *See* National Institute of Environmental Health Sciences, Manual Muscle Testing Procedures, Key to Muscle Grading, www.niehs.nih.gov/research/resources/assets/docs/muscle_grading_and_testing_procedures_508.pdf.
[4] "2+" is a normal reflex, "1+" is a low normal, diminished reflex. Stephen Russell and Marc Triola, *The Precise Neurological Exam*, NYU School of Medicine, 2006, https://informatics.med.nyu.edu/modules/pub/neurosurgery.

wane, or are present on one examination but absent on another," a claimant's impairment cannot satisfy listing 1.04)).

Furthermore, as the ALJ noted, although the record contained some findings of positive straight leg raises, there was no indication as to whether the findings were in both the sitting and supine positions as required to meet Listing 1.04(A). Tr. 25, 358, 416, 421, 432. Although Plaintiff argues that the ALJ should have contacted her treatment providers to clarify whether the straight leg raises were in the sitting or supine position (*see* ECF No. 7-1 at 18), the record reflects that Plaintiff declined to perform the straight leg raises during her consultative examination with Dr. Toor in May 2017. Tr. 250. Furthermore, the record contained other treatment records documenting negative straight leg raises. Tr. 341, 344, 429. Accordingly, the minimal evidence cited by Plaintiff fails to satisfy the listing criteria.

To meet the durational requirement, Plaintiff must establish all of the elements of the Listing for a 12-month period. A review of the records noted above demonstrates that she cannot do so. In January and February 2016, her motor strength was normal. In March 2016, there was no limitation on motion of the spine. In April 2016, her SLR was normal bilaterally; sensory was normal, and normal gait was noted as well. In June 2016, SLR testing was negative bilaterally. She also denied any trouble with motor skills. In July 2016, although there was a positive finding for SLR and sensory, motor strength for upper and lower extremities were normal. In October 2016, she returned to Rochester Brain & Spine, and the exam focused on her cervical complaints. Sensory was intact in upper extremities. Plaintiff had her cervical operation in November 2016.

In January 2017, after her cervical operation, she was reported to have normal strength in all extremities. Her February 2017 exam focused on her neck; although she was noted to walk with an antalgic gait, her strength and sensory were normal. Although, Plaintiff had positive SLR

bilaterally in March and May 2017, both visits recorded normal strength in the upper and lower extremities similar to prior visits, although there was some sensation disturbance in the right lower extremity compared to her left. In June 2017, her SLR bilaterally was negative, and heel toe walk was normal In July 2017, she had positive SLR bilaterally. Plaintiff had lumbar surgery in July 2017, and at her first post-operative visit, she had normal sensation and strength similar to prior studies.

Based on the foregoing, Plaintiff cannot make the 12-month durational requirement as to SLR. Nor can she make the durational requirement for strength or sensory. Reviewing the records in a light most favorable to Plaintiff, there is no indication that she could ever meet all the requirements for the Listing with respect to her cervical complaints. As the ALJ noted, while Plaintiff does have pain and limitations that result from her neck and back impairments (Tr. 30), she has failed to meet her burden to show that her impairments met all of the specified criteria of Listing 1.04(A). Accordingly, the ALJ made the right call on the listing requirements, and remand is not required. *See Beebe v. Astrue*, 2012 WL 3791258, *4 (N.D.N.Y. 2012) (remand not required where "plaintiff ha[s] not established that she satisfied all the criteria symptoms of the Listing"); *Tilbe v. Astrue*, 2012 WL 2930784, *10 (N.D.N.Y. 2012) (no error where "no view of the evidence would support a finding that plaintiff's impairment met all the specified medical criteria of Listing 1.04"). Because substantial evidence supports the ALJ's finding that Plaintiff did not meet or equal Listing 1.04(A), the Court finds no error.

Plaintiff next argues that the ALJ's evaluation of the medical opinion evidence and the ALJ's physical RFC determination were not supported by substantial evidence. *See* ECF No. 7-1 at 15-22. Plaintiff's argument is unavailing. Plaintiff argues that the ALJ improperly rejected the medical opinion evidence and relied on her own lay interpretation of bare medical findings. *Id.* at

18-22. Plaintiff seems to suggest that the ALJ needed a medical opinion of her functional limitations in order to assess her RFC. *Id*. However, this is not the standard. *See Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) (rejecting the argument that an ALJ cannot determine the RFC without the "support of at least some medical opinion concerning [the RFC's] limitations").

A claimant's RFC is the most she can still do despite her limitations and is assessed based on an evaluation of all relevant evidence in the record. *See* 20 C.F.R. §§ 404.1520(e), 404.945(a)(1), (a)(3); SSR 96-8p, 61 Fed. Reg. 34,474-01 (July 2, 1996). At the hearing level, the ALJ has the responsibility of assessing the claimant's RFC. *See* 20 C.F.R. § 404.1546(c); SSR 96-5p, 61 Fed. Reg. 34,471-01 (July 2, 1996); *see also* 20 C.F.R. § 404.1527(d)(2) (stating the assessment of a claimant's RFC is reserved for the Commissioner).

Determining a claimant's RFC is an issue reserved to the Commissioner, not a medical professional. *See* 20 C.F.R. § 416.927(d)(2) (indicating that "the final responsibility for deciding these issues [including RFC] is reserved to the Commissioner"); *Breinin v. Colvin*, No. 5:14-CV-01166(LEK TWD), 2015 WL 7749318, at *3 (N.D.N.Y. Oct. 15, 2015), *report and recommendation adopted*, 2015 WL 7738047 (N.D.N.Y. Dec. 1, 2015) ("It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion."). The ALJ is ultimately tasked with reaching an RFC assessment based on the record as a whole. 20 C.F.R. § 404.1527(d)(2) ("Although we consider opinions from medical sources on issues such as . . . your residual functional capacity . . . the final responsibility for deciding these issues is reserved to the Commissioner."). Moreover, the ALJ's conclusion need not "perfectly correspond with any of the opinions of medical sources cited in [his] decision," because the ALJ is "entitled to weigh all of the evidence available to make an RFC finding that [i]s consistent with the record as a whole."

*Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971).

In this case, the ALJ assessed an RFC that was consistent with the record as a whole. The ALJ considered, but appropriately gave little weight to, Dr. Zeidman's statement that Plaintiff was 100% temporarily totally disabled. Tr. 32, 425. As the ALJ noted, such a statement is an opinion on a matter reserved to the Commissioner, and therefore, is not entitled to any significant weight. *See* 20 C.F.R. § 404.1527(d) ("We will not give any special significance to the source of an opinion on issues reserved to the Commissioner . . . ."); *see also LaValley v. Colvin*, 672 F. App'x 129, 130 (2d Cir. 2017. Furthermore, the ALJ noted that Dr. Zeidman's opinion provided little insight into Plaintiff's function-by-function limitations. Tr. 32. Accordingly, the ALJ properly discounted Dr. Zeidman's statement of temporary total disability. Tr. 32, 425. *See Ackley v. Colvin*, No. 13-CV-6656T, 2015 WL 1915133, at *5 (W.D.N.Y. Apr. 27, 2015) (treating physicians' statements that the plaintiff was "completely disabled" were entitled to only little weight, where the physicians' statements failed to specify functional limitations, and were on matters reserved to the Commissioner).

The ALJ further considered, and gave partial weight to, the opinions of consultative examiner Dr. Toor and state agency medical consultant Dr. Feldman. Tr. 30, 89-91, 248-53. Plaintiff argues these opinions were stale because they were issued prior to Plaintiff's lumbar spine surgery. *See* ECF No. 7-1 at 20. While it is true these opinions were issued before Plaintiff's lumbar surgery, they were issued 18 months after Plaintiff's alleged onset date of November 2015, and after her November 2016 neck surgery. Tr. 89-91, 178, 248-53. "[A] medical opinion is not necessarily stale simply based on its age." *Dronckowski v. Comm'r of Soc. Sec.*, No. 1:18-CV-0027 (WBC), 2019 WL 1428038, at *5 (W.D.N.Y. Mar. 29, 2019) (citing *Biro v. Comm'r of Soc.*

*Sec.*, 335 F. Supp. 3d 464, 470 (W.D.N.Y. 2018); *Andrews v. Berryhill*, No. 17-CV-6368, 2018 WL 2088064, at *3 (W.D.N.Y. May 4, 2018)). Contrary to Plaintiff's contention, the ALJ properly considered these opinions as one part of the record as a whole when assessing Plaintiff's RFC. Tr. 30.

Overall, the ALJ properly considered the medical evidence, along with other evidence in the record, in assessing Plaintiff's RFC. Tr. 26-32. Specifically, the ALJ assessed Plaintiff's RFC considering her history of spinal surgery; clinical findings of painful range of cervical and lumbar spine motion, 4-5/5 extremity strength, slightly diminished to normal upper and lower extremity sensations, and normal coordination; and observations of antalgic gait with ability to walk without an assistive device. Tr. 30. The ALJ's RFC finding was based on relevant evidence that a reasonable mind might accept as adequate to support the conclusion that Plaintiff could perform at most a limited range of sedentary work. *See Bonet ex rel. T.B. v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013) ("[W]hether there is substantial evidence supporting the appellant's view is not the question here; rather, we must decide whether substantial evidence supports the ALJ's decision" (citations omitted)); *see also Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (The Commissioner's findings of fact must be upheld unless "a reasonable factfinder would have to conclude otherwise.").

Furthermore, the mere fact that the ALJ did not adopt any one opinion does not create a gap in the record as Plaintiff suggests. *See Johnson v. Colvin*, 669 F. App'x 44, 46 (2d Cir. 2016) (finding that "because the record contained sufficient other evidence supporting the ALJ's determination and because the ALJ weighed all of that evidence when making his residual functional capacity finding, there was no 'gap' in the record and the ALJ did not rely on his own 'lay opinion.'"). In this case, the ALJ's restrictive RFC finding accounted for the limitations

supported by the record. Accordingly, the Court finds that the ALJ's RFC was supported by substantial evidence.

For all reasons discussed above, the Court finds that the ALJ properly considered the record as a whole, and her findings are supported by substantial evidence substantial evidence in the record as a whole. Therefore, the Court finds no error.

## CONCLUSION

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 7) is **DENIED**, and the Commissioner's Motion for Judgment on the Pleadings (ECF No. 11) is **GRANTED**. Plaintiff's Complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE**. The Clerk of Court will enter judgment and close this case.

**IT IS SO ORDERED**.

DON D. BUSH
UNITED STATES MAGISTRATE JUDGE